**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

GARY W. MUFFLEY, Regional Director
of the Ninth Region of the National Labor
Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

                Petitioner,

v.                                CIVIL ACTION NO.  2:08-cv-00073

MASSEY ENERGY COMPANY, et al.,

                Respondents.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is the petitioner's Petition for Injunction under Section 10(j) of the National Labor Relations Act, as Amended [Docket 1].  I held a hearing on the petition on May 8 and 9, 2008, and have received post-hearing briefs from the parties and the amicus curiae. For reasons set forth below, the petition is **GRANTED in part** and **DENIED in part**. The respondents are **ORDERED**, within 15 days of this order, to offer in writing interim employment on the terms described below to those individuals named below.

**I. Background**

    A. Factual Background

In August 2004, the respondents bought a coal mining operation from Horizon Natural Resources Co. ("Horizon") after Horizon filed for bankruptcy. The coal mining operation was located on Horizon's Cannelton/Dunn property, and the respondents purchased the operations "free and clear" of the collective bargaining agreement under which the employees at the Cannelton/Dunn

1

property had previously worked. Respondent Spartan Mining Co. d/b/a Mammoth Coal Co. ("Mammoth") manages the operations at the Cannelton/Dunn property.[1]

After the respondents took control of the mine in September 2004, every former employee who had previously been a part of the "bargaining unit," and represented by the United Mine Workers of America ("UMWA"), lost his or her job. On December 3, 2004, Mammoth began hiring at the Cannelton/Dunn property. According to the petitioner, the respondents discriminated against members of the UMWA in the hiring process.

On June 2, 2005, the UMWA filed a charge with the National Labor Relations Board (the "Board") alleging that the respondents had engaged in unfair labor practices in violation of the National Labor Relations Act ("NLRA"), as amended, 29 U.S.C. §§ 151-69. The UMWA asserted that the alleged unfair labor practices began on or about December 6, 2004. In response to the charge filed by the UMWA, the petitioner, General Counsel for the NLRB, filed an administrative complaint against respondent Mammoth on August 8, 2006, pursuant to 29 U.S.C. § 160(b). On October 6, 2006, the petitioner amended the complaint to add Massey as a defendant.

After sixteen days of evidence and argument before an Administrative Law Judge ("ALJ"), the ALJ issued a lengthy and detailed Decision and Recommended Order. After setting forth the background of the dispute, the ALJ turned to the applicable legal standard. The ALJ noted that "as the new owner of Horizon's Cannelton/Dunn operation, the [r]espondents were not obligated to hire

---

[1] In a previous Memorandum Opinion & Order, I referred to Spartan Mining Co. d/b/a Mammoth Coal Co. as "Spartan." (*See* Mem. Op. & Order of Apr. 14, 2008 [Docket 48].) Having learned that Spartan Mining Co. d/b/a Mammoth Coal Co. is known to the public as "Mammoth," I will henceforth refer to the entity as "Mammoth" rather than "Spartan." This choice will also be consistent with the usage contained in the parties' briefs and memoranda.

any of the predecessor's employees, but they were not free to refuse employment to the predecessor's employees because those employees were represented by a union or in order to avoid having to recognize and bargain with the [UMWA]." (ALJ Decision 19 [Docket 64, Ex. 1].)  The General Counsel of the NLRB can demonstrate a violation of the NLRA if he proves that a successor employer "failed to hire employees of its predecessor and was motivated by antiunion animus." (*Id.*) If the General Counsel meets its burden, the ALJ stated, "'the burden then shifts to the employer to prove that it would not have hired the predecessor's employees even in the absence of its unlawful motive." (*Id.* 19-20 (citing *Planned Bldg. Servs.*, 347 NLRB No. 64, slip op. at 4-5 (2006).)

As for factual findings, the ALJ found that "since December 3, 2004, the [r]espondents discriminatorily denied employment to the predecessor's employees on the basis of their membership in the predecessor's bargaining unit and their prounion sentiments in an effort to avoid the Board's successorship doctrine, minimize the likelihood of a workforce that would elect to create a new bargaining obligation, and discourage union activity." (*Id.* at 59.)  In making these findings, the ALJ relied on evidence that, among other things, (1) "during initial hiring at Mammoth, Massey officials made it known to Mammoth officials that the operation would be 'union free," (2) "during the hiring process, the [r]espondents gave applicants a document which matter-of-factly stated that 'the mine is nonunion,' (3) when applicants stated an intent to "work to organize the Mammoth workforce on behalf of the  UMWA, those remarks were held against them in the hiring process," (4) a spreadsheet used in the hiring process listed little about the Cannelton/Dunn miners other than their approximate "union time," (5) "the [r]espondents also asked a number of the alleged discriminatees whether they would cross the picket lines," and (6) "when an employee suggested to Stevens, a Mammoth supervisor, that the company could address the shortage of experienced

3

miners at Mammoth by hiring more of the displaced Cannelton/Dunn unit employees, Stevens dismissed the suggestion, replying that '[Massey CEO] Don Blankenship's a smart man, he's not going to let the numbers go against him.'" (*Id.* at 21-22.)

The ALJ concluded that although the respondents offered a multitude of non-discriminatory reasons for not hiring the Cannelton/Dunn bargaining unit employees, these reasons were "shifting," "often contradictory or inconsistently applied," and the "vast majority . . . simply false." (*Id.* at 59.) Accordingly, the ALJ found that the respondents had not met their burden of proving that the unit employees would not have been hired absent antiunion animus, and that the respondents violated § 8(a)(3) and (1) of the NLRA by discriminatorily refusing to hire Cannelton/Dunn unit employees. (*Id.*)

Next, the ALJ addressed whether the respondent Mammoth violated § 8(a)(5) of the NLRA by refusing, as successors, to bargain with the UMWA as the exclusive bargaining representative of the unit employees and by unilaterally establishing mandatory terms and conditions of employment for the unit employees. (*Id.* at 60.) The standard for successorship, the ALJ held, was "(1) whether the new employer conducts essentially the same business as the predecessor employer, and (2) whether a majority of the new employer's work force in an appropriate unit are former employees of the predecessor employer." (*Id.*) The ALJ determined that Mammoth continued the same business as Cannelton/Dunn. (*Id.*) The ALJ also determined that because Mammoth discriminatorily refused to hire its predecessor's employees in order to avoid the Board's successorship doctrine, administrative precedent permitted a presumption that, "absent discrimination, the [r]espondents would have hired a majority of their employee complement from among Cannelton/Dunn's unit employees," and, in addition, "they would have employed essentially

4

all of Cannelton/Dunn's unit employees." (*Id.* at 62.)  The ALJ therefore found that respondent Mammoth was the legal successor to Horizon's Cannelton/Dunn operation, (*Id.* at 63), and that Mammoth had a bargaining obligation. (*Id.* at 64.)  In addition, the ALJ found that Mammoth forfeited a successor employer's right to initial terms and conditions of employment by discriminatorily refusing to hire the predecessor units employees and by telling prospective job applicants that the mine would be union-free. (*Id.* at 64.)

In sum, the ALJ found that "[s]ince December 3, 2004, the [r]espondents have violated Section 8(a)(3) and (1) of the Act by discriminatorily refusing to hire former employees of Horizon's Cannelton/Dunn operation for positions in the Mammoth bargaining unit." *(Id.* at 66.)  In addition, the ALJ found that "[s]ince December 3, 2004, the Respondents have violated Section 8(a)(5) and (1) by failing and refusing to recognize and bargain with the Union and by unilaterally changing the terms and conditions of employment that had been in effect for bargaining unit employees prior to the transfer of control and ownership of Horizon's Cannelton/Dunn operation to the Respondents." (*Id.*)

As a remedy, the ALJ recommended that, among other things, the respondents be ordered to immediately offer to certain individuals employment in the positions for which they would have been hired absent unlawful discrimination, "or if those positions no longer exist, to substantially equivalent positions, discharging if necessary any employees hired to fill those positions." (*Id.* at 67.) The ALJ also recommended that the respondents be ordered to recognize and bargain with the UMWA and to rescind the unilateral changes made by the respondents until the respondents negotiate in good faith with the UMWA to agreement or impasse. (*Id.*)

The respondents have filed exceptions to the ALJ's decision with the Board.

B. Procedural History

On January 31, 2008, the petitioner, on behalf of the Board, filed a Petition for Injunction under Section 10(j) of the National Labor Relations Act, as Amended [Docket 1]. The petitioner's proposed injunction mirrored the relief recommended by the ALJ. (*See* Pet'r's Proposed Prelim. Inj., Pet. Ex. 8 [Docket 1].)

The respondents answered the petition and filed motions to dismiss it. By a Memorandum Opinion and Order filed on April 14, 2008, I denied in part the respondents' motions. On May 8 and 9, 2008, I held a hearing on the petition, and the court ordered the parties to file post-hearing briefs. The parties complied, and this matter is ripe for adjudication.

**II. Preliminary Issues**

The court must resolve two primary issues.  First, I must determine what test I should use or factors I should consider when addressing whether temporary injunctive relief is "just and proper" under Section 10(j) of the NLRA, 29 U.S.C. § 160(j). I then must apply this test and decide whether issuing an injunction would be just and proper.  Before I reach these primary issues, however, there are also two preliminary questions that I must answer: (1) whether the petitioner has the authority to bring the § 10(j) petition, and (2) whether, and for what purposes, the court should take judicial notice of the ALJ's Decision and Recommended Order.

A. Petitioner's Authority to Bring 10(j) Petition

The respondents argue that the petitioner has no authority to bring a § 10(j) petition. (Mammoth's Br. 32 [Docket 69].) I rejected this argument twice. (*See* Mem. Op. & Order of Apr. 14, 2008 [Docket 48]; Mem. Op. & Order of Apr. 29, 2008 [Docket 54].) The respondents acknowledge the court's prior opinions but raise the issue again because they have a "firm view that

6

the delegations were illegal and has concern that the Court's continuing view arises from Mammoth's inadequate argument." (Mammoth's Br. 2 n.2.)

The respondents' arguments on this issue have already been addressed, and I decline to reconsider them. Consistent with the court's prior opinions, I **FIND** that the Board's delegation to the General Counsel of its authority to authorize and initiate the filing of petitions for § 10(j) injunctions was lawful, and I **FIND** that it was lawful for the Deputy General Counsel to stand in the stead of the General Counsel when he authorized the filing of a § 10(j) petition.

B. Judicial Notice of ALJ's Decision and Recommended Order

The next preliminary issue is whether, and if so for what purposes, the court should use the ALJ's Decision and Recommended Order.  The petitioner asserts that the court should "take judicial notice of Administrative Law Judge Bogas's decision and accept the factual findings therein." (Pet'r's Br. 14.) The petitioner argues that "a favorable administrative law judge's decision bolsters the Regional Director's reasonable cause argument, since the administrative law judge decision is an agency decision made by the independent fact-finder who conducts the only evidentiary hearing in the administrative proceeding, and whose credibility determinations are given deference by the Board itself." (*Id.*) The petitioner also points out that while this court may find differently from the ALJ, it would be helpful for the court to take notice of the ALJ's factual conclusions because (a) the case is "massive," (b) the evidentiary record before the ALJ was much more extensive than the record developed before this court, and (c) both parties have referred to the ALJ decision in their briefs. (Pet'r's Reply 4.) The petitioner cites several cases where district courts relied on ALJ opinions in ruling on § 10(j) petitions. (Pet'r's Br. 14.)

The respondents counter by arguing that the court should not take judicial notice of the

ALJ's decision "except as it relates to the issues of 'reasonable cause' or 'likelihood of success on the merits,' and, in that context, what the ALJ considered and recommended in his decision and order." (Mammoth's Br. 25.)  The respondents note that courts can only take judicial notice of facts that are not subject to reasonable dispute, and the respondents argue that the facts as set forth by the ALJ are disputed, given that the respondents have appealed the ALJ's decision. (*Id.* at 25-27.) The respondents believe that it would be appropriate for the court  to take judicial notice of the fact of the ALJ's decision, but not for the truth of the matters asserted therein. (*Id.* at 27.)

Rule 201 of the Federal Rules of Evidence states that a "court may take judicial notice, whether requested or not" and "shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(c)-(d). In order to take notice of a fact, the fact must be "one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

I **FIND** that it is appropriate to take judicial notice of the fact that the ALJ issued a Decision and Recommended Order.  No party disputes that the ALJ issued a decision.  I will also take judicial notice of the findings and conclusions of law the ALJ made in his Decision and Recommended Order. That is, it is beyond dispute that the ALJ made certain findings and reached certain conclusions of law. What these findings and conclusions are is also capable of accurate and ready determination – all one need do is read the decision, a source the accuracy of which cannot be questioned.  The court will not, however, accept the ALJ's findings of fact as true, because the respondents have disputed the accuracy of the factual findings and the court must review conclusions of law. That being said, when assessing whether injunctive relief is just and proper, this

court will look at whether an injunction is necessary to preserve the ability of the Board to issue a meaningful remedy should the Board find that the respondents have violated the NLRA. Thus, the court must assume, for the purposes of the "just and proper" analysis, that the respondents have violated the NLRA, which was the decision of the ALJ.

I note, however, that the parties have spent a significant amount of effort arguing about an issue that is not very important. First, as I will describe in greater detail below, the respondents have conceded that the petitioner has demonstrated reasonable cause to believe that they violated the NLRA, making reliance in the ALJ's decision unnecessary on that issue. Second, it is unclear what utility, if any, the ALJ's decision serves in determining whether injunctive relief is "just and proper." As noted by the respondents early in this case, the "just and proper" issue "was not part of the Board's Complaint" and "was not part of the proceeding before the ALJ." (Mammoth's Resp. Opp. Mot. to Adjudicate 3 [Docket 33].)  Because the ALJ made no findings and heard no evidence regarding the propriety of a temporary injunction, the ALJ's opinion at best provides the court with background information.

### III. Primary Issues

I turn next to the two primary issues.

### A. Standard

Under § 10(j) of the NLRA, once the Board issues a complaint alleging unfair labor practices, the Board may petition a district court for temporary injunctive relief. 29 U.S.C. § 10(j). The district court then has the power "to grant to the Board such temporary relief or restraining order as it deems just and proper." (*Id.*) Section 10(j) relief is considered an extraordinary remedy. *Ledford v. Mining Specialists, Inc.*, 865 F. Supp. 314, 322 (S.D. W. Va. 1993) (Copenhaver, J.); *Clark v.*

*Fieldcrest Cannon, Inc.*, Case No. 4:93-cv-308, 1994 WL 1027520, at *4 (M.D.N.C. Aug. 25, 1994).

Traditionally, courts in the Fourth Circuit apply a two-step analysis in determining whether a § 10(j) injunction is appropriate in a given case. Under this approach, the district court asks first whether there is reasonable cause to believe that the NLRA has been violated. *Ledford*, 865 F. Supp. at 318. "Reasonable cause exists if 'there is some reasonable possibility that the Board will ultimately enter an enforceable order.'" *Id.* (quoting *Humphrey ex rel. NLRB v. Int'l Longshoremen's Ass'n AFL-CIO*, 548 F.2d 494, 498 (4th Cir. 1977)). If a court finds that there is reasonable cause to believe that NLRA has been violated, it must then determine whether injunctive relief is "just and proper." *D'Amico v. Townsend Culinary, Inc.*, 22 F. Supp. 2d 480, 484 (D. Md. 1998); *Ledford*, 865 F. Supp. at 318.

For injunctive relief to be just and proper, "[i]t must appear from the circumstances of the case that the remedial purposes of the [NLRA] will be frustrated unless relief pendente lite is granted." *NLRB v. Aerovox Corp.*, 389 F.2d 475, 477 (4th Cir. 1967). Similarly, § 10(j) relief is "just and proper" when "'the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless'" absent temporary relief. *Id.* (quoting *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967); *Ledford*, 865 F. Supp. at 321 (noting that § 10(j) injunctive relief is just and proper only on a showing that "failure to grant the relief would dissipate the effective exercise of the Board's remedial power and render meaningless any final order it issued"). "[R]elief under section 10(j) 'is proper not to remedy unfair labor practices but merely to preserve conditions in a particular case so that any remedy the NLRB might choose will have a chance to be effective." *Ledford*, 865 F. Supp. at 322 (quoting *Clark v. Int'l Union, UMWA*, 722 F. Supp. 250, 253 (W.D. Va. 1989)). Should a

court find that injunctive relief is "just and proper," it may enter an injunction to preserve and restore the status quo pending completion of the Board's normal procedures. *Id.* The relevant status quo "is the situation which existed just before the alleged unfair labor practice occurred." *Id.* at 323.

The reasonable cause/just and proper framework used by courts in the Fourth Circuit was established forty years ago in *NLRB v. Aerovox Corp.*, 389 F.2d 475 (4th Cir. 1967). Since that time, other circuits have moved away from the two-step analysis and toward the traditional equitable standard for granting a preliminary injunction. *Timmins ex rel. NLRB v. Narricot Indus.*, Case No. 2:08-cv-189, 2008 WL 2872310, at *3 (E.D. Va. July 24, 2008); *see also Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 237 (6th Cir. 2003) (noting circuit split). Some of these courts have rejected the reasonable cause/just and proper test altogether. *See Sharp v. Parents in Cmty. Action, Inc.*, 172 F.3d 1034, 1037-38 (8th Cir. 1999); *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994). Other courts have retained the "reasonable cause" prong, but have folded the traditional equitable factors into the "just and proper" analysis. *Pye ex rel. NLRB v. Sullivan Bros. Printers, Inc.*, 38 F.3d 58, 63 (1st Cir. 1994). The Sixth Circuit, on the other hand, has retained the reasonable cause/just and proper standard. *Ahearn*, 351 F.3d at 236.

The Fourth Circuit has not had occasion to address the proper § 10(j) standard since *Aerovox*. Consequently, I am obligated to apply the two-step reasonable cause/just and proper analysis. As Judge Smith pointed out in *Timmins*, however, the portion of *Aerovox* that held that "the government is not required to show irreparable injury when it seeks an injunction to give effect to an act of Congress, 389 F.2d at 477, has been called into question by the Supreme Court's decision in *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-20 (1982). *Timmins*, 2008 WL 2872310, at *3 n. 13. There, the Court held that unless Congress clearly limits the equitable discretion of the courts,

11

district courts should be able to exercise fully their traditional equitable discretion when determining whether to grant an injunction under a federal statute. *Romero-Barcelo*, 456 U.S. at 320.

In light of *Romero-Barcelo*, some district courts within this circuit have considered whether to incorporate equitable principles into the "just and proper" prong of the traditional § 10(j) test. In *Clark v. Fieldcrest Cannon, Inc.*, for example, the district court noted that "it is unclear whether the Fourth Circuit has authorized district courts to apply traditional equity principles in arriving at its 'just and proper' determination." *Clark*, 1994 WL 1027520, at *4. The court also recognized, though, that the Supreme Court found that district courts should typically balance the interests of the parties when addressing injunctive relief. *Id.* Ultimately, the *Clark* court avoided the issue by finding that injunctive relief was inappropriate under either the traditional test or the test incorporating the Fourth Circuit's four-factor preliminary injunction test. *Id.* Likewise, the court in *D'Amico v. Townsend Culinary*, applied "the traditional equitable principles in making its 'just and proper' determination." *Townsend Culinary*, 22 F. Supp. 2d at 486. In *Timmins*, Judge Smith found that "[i]n the absence of a Fourth Circuit mandate directing otherwise, this court will apply the reasonable cause/just and proper standard, which remains in effect in this circuit." *Timmins*, 2008 WL 2872310, at *3. At the same time, Judge Smith found it appropriate to consider equitable criteria, so long as a court keeps in mind the purposes of § 10(j), "'which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge.'" *Id.* at *3 and n.15 (quoting *Cal. Pac. Med. Ctr.*, 19 F.3d at 459-60).

I agree with *Townsend Culinary* and, particularly, *Timmins*, and find it appropriate to incorporate equitable principles into its "just and proper" analysis. As a consequence, I reject the petitioner's argument that the "'just and proper' analysis is limited to a determination of whether

it appears 'from the circumstances of the case that the remedial purposes of the Act will be frustrated unless relief *pendents* [sic] *lite* is granted.'" (Pet'r's Br. 10 (quoting *Aerovox*, 389 F.2d at 477).) But I also disagree with the respondents argument that it is necessary to graft the four-part preliminary injunction test from *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991), onto § 10(j)'s "just and proper" inquiry. According to the Court in *Romero-Barcelo*, "the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims." *Romero-Barcelo*, 456 U.S. at 312 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). Not only must a court balance the interests of the parties, it should pay "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* These equitable principles can be taken into account without transplanting the somewhat complicated *Direx Israel/Blackwelder* into the § 10(j) context. *See*, *e.g.*, *Ledford*, 865 F. Supp. at 325 (balancing the harms of the parties without applying the four-factor test).

To sum up, I will apply the reasonable cause/just and proper test that is still the prevailing test in this circuit. When considering whether § 10(j) relief is "just and proper," I will not only take into account whether the Board's remedial powers would be frustrated and its final order rendered meaningless without injunctive relief," but I will also assess the interests of the respondents and the public.

B. Analysis

*1. Reasonable Cause*

As noted above, I must first determine whether the petitioner has demonstrated that there is reasonable cause to believe that the respondents violated the NLRA. Reasonable cause exists if there is some reasonable possibility that the Board will enter an enforceable order, and "it is neither

necessary nor proper for the court to decide the unfair labor practice charge on the merits." *Ledford*, 864 F. Supp. at 318. "In deciding whether the evidence could reasonably support a finding that an unfair labor practice has been committed, the evidence is to be viewed in the light most favorable to the Board." *Id.*

Here, the respondents concede that the petitioner is able to prove that "reasonable cause" exists. (Mammoth's Mem. in Supp. Mot. Dismiss 15 [Docket 27].) Concession notwithstanding, an ALJ has concluded that the respondents violated the NLRA. Consequently, I **FIND** that there is reasonable cause to believe that the respondents have violated § 8(a)(3) and (1) fo the NLRA by discriminatorily refusing to hire former employees of Horizon's Cannelton/Dunn operation for positions in the Mammoth bargaining unit. I also **FIND** that there is reasonable cause to believe that the respondents have violated § 8(a)(5) and (1) by failing and refusing to recognize and bargain with the UMWA and by unilaterally changing the terms and conditions of employment that had been in effect for bargaining unit employees prior to the transfer of control and ownership of Horizon's Cannelton/Dunn operation to the respondents. I further **FIND** that there is reasonable cause to believe that the Board will ultimately enter an enforceable order remedying these violations.

### 2. *Just and Proper*

The injunction requested by the petitioner consists of several parts. First, the petitioner requests that the court prohibit the respondents from (a) refusing to hire former bargaining unit employees of Cannelton/Dunn because of their union-represented status or to avoid having to recognize and bargain with the union, (b) refusing to recognize and bargain in good faith with the UMWA as the exclusive collective-bargaining representative of Mammoth's employees in a defined bargaining unit, (c) unilaterally changing wages, hours, and other terms and conditions of

employment of employees in the unit, and (d) otherwise restraining the employees exercise of rights guaranteed by § 7 of the NLRA. (Pet'r's Proposed Prelim. Inj.; Pet. Ex. 8.) Second, the petitioner requests that the court order the respondents to: (i) offer interim employment at their Mammoth operations to certain former Cannelton/Dunn employees in their former positions or in substantially equivalent positions, without prejudice to their seniority or any other rights, (ii) recognize and, on request, bargain with the UMWA as the exclusive representative of the employees in a defined unit concerning terms and conditions of employment, (iii) at the request of the UMWA, rescind any departures from the terms and conditions of employment of unit employees that existed immediately prior to the respondents' takeover of the Cannelton/Dunn operations, retroactively restoring preexisting terms and conditions of employment, until the respondents negotiate in good faith with the UMWA, (iv) post copies of this courts Memorandum Opinion and Order at Mammoth's operations and grant agents of the NLRB reasonable access to the Mammoth operations to monitor compliance with this posting requirement, (v) convene all employees and allow a Board agent to read the Memorandum Opinion and Order to the employees, and (vi) file within 20 days a sworn affidavit from a responsible official setting forth with specificity the manner in which the respondents have complied with this court's order. (*Id.*)

The petitioner's proposed injunction mirrors substantially the order recommended by the ALJ. This is problematic because "relief under section 10(j) 'is proper not to remedy unfair labor practices.'" *Ledford*, 865 F. Supp. at 322 (quoting *Clark v. Int'l Union, UMWA*, 722 F. Supp. 250, 253 (W.D. Va. 1989)). Courts must not substitute themselves for the Board. *Id.* ("[T]he relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power." (quoting *Gottfried v. Sheet Metal Workers'*

*Int'l Ass'n, Local Union No. 89,* 927 F.2d 926, 928 (6th Cir. 1991)).

In any event, I will now turn to the relief requested by the petitioner and determine whether temporary injunctive relief is "just and proper" in this case.

The petitioner argues that it would be just and proper for this court to order the respondents to offer the miners that were allegedly discriminated against employment at Mammoth's operations in their former positions or in substantially equivalent positions. According to the petitioner, by the time the Board issues an order, it is likely that many of the miners allegedly discriminated against will be unable to return to work due to their having retired or moved out of the area to find other jobs. The petitioner also argues that a Board order cannot replace the time lost by miners who, having found jobs elsewhere, now have lengthy commutes. The petitioner asserts that absent injunctive relief, support for the UMWA will dissipate to the point that the UMWA may be powerless by the time the Board issues an order.

After reviewing the record, and having balanced the interests of the petitioner and alleged discriminatee miners, the respondents, and the public, I **FIND** that it would be just and proper to order the respondents to offer the alleged discriminatees interim employment. UMWA Local 8843 President William "Bolts" Willis testified that he estimated that the average age of the miners at Horizon's Cannelton/Dunn operation was around 54 years old at the time Horizon shut down in 2004. (Tr. Vol. 1 at 51). This means that the average age would be 58 years old now. Mr. Willis also testified that most miners retire between the ages of 62 and 65. (Tr. Vol. 1 at 52).

In addition, Mr. Willis testified that, although many of the alleged discriminatees originally lived close to the Cannelton/Dunn mines, some had moved away from the area, (Tr. Vol. 1 at 53, 59, 65, 68, 77-78.) after the respondents took over the Cannelton/Dunn operation. Michael Cordle,

another former Cannelton/Dunn miner, testified that he was laid off from Cannelton upon the respondents' takeover, and subsequently took a job at Patriot Coal. (Tr. Vol. 17-18.) Whereas at Cannelton Mr. Cordle worked on the surface, at Patriot Coal he worked underground performing manual labor. (Tr. Vol. 2 at 18.) His commute increased from ten minutes to an hour and a half. (Tr. Vol. 2 at 19.) Mr. Cordle testified that because of this change in employment, he no longer has time to mow his own grass, spend time with his wife and grandchildren, or otherwise do anything unrelated to work. (Tr. Vol. 20-21.) Likewise, Charles Treadway, an alleged discriminatee miner, had his commute lengthened from 35 to 40 minutes at Cannelton, to two hours at his new job, and he finds it difficult to spend time with his family. (Tr. Vol. 2 at 25-30.)

Without an injunction, there exists a substantial danger that many of the alleged discriminatee miners will have moved out of the area or retired before the Board can order the respondents to offer them employment at Mammoth. Moreover, no Board order can replace the time lost by miners who have had to travel far from home to find employment after the respondents allegedly discriminated against them. The respondents urge me to disregard Mr. Willis's testimony because it was incompetent, unreliable, and speculative. The respondents point out that Mr. Willis did not produce any records supporting his estimate of average miner age and average retirement age. I credit Mr. Willis's testimony. Mr. Willis worked for the Cannelton operation for approximately twenty years and has been the president of the local union for over six years, and thus is capable of making estimates about his co-workers. (Tr. Vol. 1 at 50). As I noted during the hearing, "most people can be observant and give an estimate of the average age" of a group of persons. (Tr. Vol. 1 at 51.)

The petitioner's evidence that, absent an injunction, the UMWA's strength will dissipate to

17

the point that a Board order cannot restore it is much weaker than the petitioner's evidence regarding the irreparable harm being done to the discriminatee miners. Mr. Willis did testify that in 2004, when Cannelton/Dunn went bankrupt, the union received one hundred percent participation in rallies and protests. (Tr. Vol. 1 at 46.) As time passed, Mr. Willis testified, "participation started falling off because people lost hope in getting their job back, out of money, sickness." (*Id.*) Mr. Willis also testified, however, that when the NLRB got involved, union participation increased again. (Id.) According to Mr. Willis, union participation levels have ebbed and flowed from 2004 until the present. When large events occur – hearings, rallies, etc., – union participation is high. (Tr. Vol. 1 at 49-50.) When "nothing is going on," however, such as when administrative agencies or courts are deliberating, participation in normal union meetings is low. (*Id.*)

I agree with the respondents that the petitioner has not produced overwhelming evidence that unless the discriminatee miners are reinstated, the UMWA's strength will sink so low that the Board will not be able to restore it. That being said, it is well established that when a successor employer discriminates against its predecessor's employees, irreparable harm to the collective bargaining process results. *See Bloedorn v. Francisco Foods, Inc*., 276 F.3d 270, 298 (7th Cir. 2001). "Given the uncertainties that both the union and its members face during the transition [from predecessor to successor], a successor's refusal to recognize the union or, . . . its refusal to hire a majority of the predecessor's employees so as to escape that obligation inflicts a particular potent wound on the union and its members." *Id.*; *see also Pye ex rel. NLRB v. Excel Case Ready*, 238 F.3d 60, 74-75 (1st Cir. 2001) ("This court has indicated that the 'discharge of active and open union supporters . . . risks a serious adverse impact on employee interest in unionization' and create irreparable harm to the collective bargaining process." (citing *Pan Am. Grain Co.*, 805 F.2d, 23, 27  (1st Cir. 1986)).

When a new employer refuses to bargain with the union or discriminates against employees based on their prounion sentiment, it "disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Fall River Dyeing v. NLRB*, 482 U.S. 27, 49-50 (1989) (citing *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944)). The absence of key union organizers can erode support for a union, and the fear of employer retaliation after the firing, or in this case, discriminatory non-hiring, of union supporters is "exactly the irreparable harm contemplated by § 10(j)." *Excel Case Ready*, 238 F.3d at 75.

In situations like the present case, "the remedial authority of the Board cannot entirely cure the harms that will occur in the interim." *Bloedor*n, 276 F.3d at 299. Although the Board can order an employer to offer jobs to or "reinstate" employees not hired for inappropriate reasons, "the reality is that the rejected employees are moving on to other jobs; as additional time passes, the likelihood that they will be interested in or able to accept a position" with  the employer lessens. Id. This implicates § 10(j) because "the fact that the original union organizers will never return to work if interim relief is not granted may itself cause injury to the unionization effort." *Excel Case Ready*, 238 F.3d at 75. Moreover, the fear of employer retaliation after the firing, or in this case - discriminatory non-hiring, of union supporters "is exactly the 'irreparable harm' contemplated by § 10(j). Id. (quoting *Asseo v. Centro Medico Del Turabo*, 900 F.2d 445, 454 (1st Cir. 1990)); *see also NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996) ("The 'dischargees' will seek, and obtain, new employment. . . . Meanwhile, the employees remaining at the plaint know what happened to the terminated employees, and fear that it will happen to them. The union's position in the plant may deteriorate to the point that effective organization and representation is no longer possible.").

When assessing the propriety of § 10(j) relief, a district court cannot turn a blind eye to the effect of the passage of time. Electro-Voice, 83 F.3d at 1573. I find that in this case, there is sufficient evidence that if no injunction is entered, the Board will not be able to repair the damage to the collective bargaining process, should it find that such damage was caused by the respondents having discriminated against prounion miners.

I also find that the balance of harms favors the petitioner. The respondents argue that if Mammoth is forced to make room for discriminatees, it will have to provide its current employees with other employment or continue to pay them for two and one-half years. According to the respondents, the costs would be substantial. The respondents also argue that the cost of the disruption of integrating and training a complete new workforce would be incalculable. In addition, the respondents contend that an injunction would harm Mammoth's current employees. The respondents insinuate that its current employees might have to be fired if the court orders interim reinstatement of the discriminatee miners, and that this will harm the current employees just as much as the discriminatees were harmed by having not been hired. Likewise, the respondents maintain that the current Mammoth employees would, if fired, lose the employer contribution to their pension funds.

I find the respondents arguments unpersuasive. The respondents have not demonstrated that they will be harmed at all by having to hire additional experienced miners, such as the discriminatees. As of March 30, 2008, respondent Massey was advertising in Charleston newspapers for experienced and inexperienced surface and underground miners. (Job Fair Advertisement, Petr's Ex. 1 [Docket 68].) In fact, Mammoth has started having employees sign non-compete agreements designed to keep a stable work force. (Tr. Vol. 2 at 61.)  Consequently, it is unlikely that ordering

the respondents to offer the discriminatees jobs would lead to massive displacements of current workers or layoffs. Perhaps more importantly, the respondents cannot use the purported harm to their current workforce to offset the harms that would result from the absence of an injunction. After all, the current workforce only exists because of the petitioner's discriminatory conduct. I cannot countenance a situation where an employer can discriminate against its predecessors employees and hire new employees, and then use the harm to the new employees as a basis for not providing the discriminatees relief. To do so would be to allow the respondents to benefit from their own misconduct, misconduct which the court has reasonable cause to believe occurred.

For the reasons set forth above, I **FIND** I find that an injunction is necessary to preserve the power of the Board to provide an effective remedy in this case. Specifically, I **FIND** that if no injunction issues, the Board will not be able to remedy the harm to the discriminatees, UMWA, and collective bargaining process that the respondents' discrimination has caused. Thus, I **FIND** that it is just and proper to order the respondents to offer employment to the discriminatees in the manner set forth below. I do not find it just and proper, however, to order the respondents recognize and, on request, bargain with the UMWA as the exclusive representative of the employees in a defined unit concerning terms and conditions of employment; at the request of the UMWA, rescind any departures from the terms and conditions of employment of unit employees that existed immediately prior to the respondents' takeover of the Cannelton/Dunn operations, retroactively restoring preexisting terms and conditions of employment, until the respondents negotiate in good faith with the UMWA; post copies of this courts Memorandum Opinion and Order at Mammoth's operations and grant agents of the NLRB reasonable access to the Mammoth operations to monitor compliance with this posting requirement, and; convene all employees and allow a Board agent to read the

Memorandum Opinion and Order to the employees.

The petitioner has not demonstrated that forcing the respondents to recognize and bargain with the UMWA will protect the Board's remedial power. Ordering bargaining would likely increase the strength of the union. But it has not been established that in the absence of bargaining the union would be irrevocably weakened. Moreover, a § 10(j) injunction should preserve the status quo that existed just before the alleged unfair labor practice occurred. Here, it does not appear that respondents had a duty to recognize and bargain with the UMWA at the time just prior to the alleged unfair labor practices.[2] Moreover, § 10(j) is reserved for serious and extraordinary cases. As a consequence, a court should do the minimum necessary to preserve the power of the Board to issue an effective remedy. In the present case, ordering the respondents to offer the discriminatees jobs is sufficient. It will keep the alleged discriminatees at Mammoth, preserving the ability of the Board to reinstate these employees, and it will lessen the chilling effect that the respondents' alleged discrimination may have had on all of the respondents employees.

Similarly, to order the respondents to "rescind any departures from the terms and conditions of employment of unit employees that existed immediately prior to the respondents' takeover of the Cannelton/Dunn operations, retroactively restoring preexisting terms and conditions of employment, until the respondents negotiate in good faith with the UMWA" would not only be substituting final Board relief for the interim relief authorized by § 10(j), it would cause a great hardship on Mammoth's current employees, who may prefer the terms of the employment as they currently exist. I also do not find it necessary or appropriate to order that copies of this Memorandum Opinion and

---

[2] I am confident that should enough of the alleged discriminatees accept positions at Mammoth to trigger bargaining obligations with the UMWA, the respondents will comply with the requirements of federal labor law in this regard.

Order posted or read.

### 3. Delay

Before concluding, I must address the respondents' arguments regarding delay. The respondents have argued throughout this litigation that the petitioner's delay in bringing the § 10(j) petition undercuts its argument that injunctive relief is "just and proper" to the extent that the delay alone justifies the dismissal of the § 10(j) petition. The petitioner could have filed a § 10(j) petition as early as August 2006. The petitioner did not file this petition until January 31, 2008. I agree with the respondents that this delay is troubling and that it undercuts the petitioner's arguments in favor of temporary injunctive relief. That being said, delay is only a factor that a court may consider in its just and proper analysis. *Sharp ex rel. NLRB v. Webco Indus., Inc.*, 225 F.3d 1130, 1136 (10th Cir. 2000). Here, the petitioner argues that this case was factually complex and had a "huge" record. According to the petitioner, it was more efficient to litigate the substantive issues before the ALJ and then turn to the district court for § 10(j) relief with an ALJ decision in hand then it would be to litigate the substantive issues before an ALJ and the "reasonable cause" issue before a district judge simultaneously. While I do not believe that the petitioner's justification would be persuasive in every, or even most, cases, I nonetheless **FIND** that the petitioner's delay in bringing the § 10(j) petition should not result in dismissal. Consequently, the respondents' motions to dismiss due to delay are **DENIED**.

## IV. Relief

I **ORDER** that the respondents, within 15 days of this order, offer in writing interim employment at their Mammoth operations, to the following named former employees of Cannelton/Dunn in their former positions or, if such positions no longer exist, in substantially

equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed and displacing, if necessary, any other hired or reassigned workers:

Michael Armstrong, Charles Bennett, Randel Bowen, Sr., Roger Bowles, Joseph Brown, Norman Brown, Mark Cline, Leo Cogar, Tilman Cole, Russell Cooper, Michael Cordle, Terry Cottrell, David Crawford, Jackie Danberry, Kenneth Dolin, Dewey Dorsey, Thomas Dunn, Robert Edwards, Stanley Elkins, William Fair, Jr., Lacy Flint, Ronald Gray, James Hanshaw, Paul Harvey, Charles Hill, Cheryl Holcomb, Robert Hornsby, Clarence Huddleston, Jeffrey Hughes, Harry T. Jerrell, Jimmy Johnson, Mike Johnson, Alvin Justice, John Kauff, Tommie Keith, Barry Kidd, Randy Kincaid, Chester Laing, Everett Lane, Marion "Pete" Lane, Rodney George Leake, Danny Legg, William Lary McClure, Robert McKnight, Jr., Ricky Miles, James Mimms, Gregory Moore, James Moschino, James Nichols, Robert Nickoson, William Nugent, Charles Nunley, John Nutter, Ronald Payne, David Preast, Danny Price, Doyle Roat, Gary Roat, Michael Roat, Paul Roat, Shannon Roat, Gary Robinson, Charles Rogers, Michael Rosenbaum, Michael Ryan, Melvin Seacrist, Lawson Shaffer, Russell Shearer, Dwight Siemiaczko, Charles Parker Smith, Donald Stevens, Jeffrey Styers, Jackie Tanner, Roger Taylor, Gary Totten, Charles Treadway, Byron Tucker, Jr., Larry Vassil, Thomas Ward, James Whittington, Jr., Philip Williams, William Willis, Ralph Wilson, Gary Wolfe, and Fred Wright.[3]

## V. Conclusion

The court **GRANTS in part** and **DENIES in** part the petitioner's § 10(j) petition. The court

---

[3] The respondents argue that any order must be limited to the Cannelton/Dunn properties, mines, and other facilities acquired from Horizon. That is, the respondents assert that the order cannot refer to property Mammoth did not so acquire. Predictably, the petitioner disagrees. I find that in light of the respondents practice of moving miners among properties, and given that the focus of Mammoth's operations has changed since 2004, it would be more equitable to apply the order to Mammoth, not just the properties it acquired from Horizon.

**DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:      August 29, 2008

Joseph R. Goodwin, Chief Judge